# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| LAWRENCE L. PICKETT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 16 C 4337 |
| | ) | |
| CHICAGO TRANSIT AUTHORITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

On April 15 2016, Plaintiff Lawrence L. Pickett ("Pickett") filed a *pro se* Complaint of Employment Discrimination ("Complaint") against Defendant Chicago Transit Authority ("CTA"), a municipal corporation in Chicago, Illinois. The Complaint alleges disability discrimination and failure to accommodate in violation of the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"), alongside age discrimination in violation of the Age Discrimination Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA").

Discovery has been completed, permitting the Court's consideration of CTA's motion for summary judgment, which seeks judgment in the entirety in CTA's favor. In reply briefing, CTA also moved to strike both of Pickett's responsive summary judgment submissions, which Pickett stylized as, respectively, his "Motion for Summary Judgment" ("Pickett's Motion") and "Plaintiff's Statement of Material

Undisputed Facts in Support of Its Motion for Summary Judgment" ("Pickett's Facts"). Pickett, still arguing *pro se* on his own behalf, opposes. For the following reasons, the Court denies CTA's motion to strike Pickett's Motion, denies CTA's motion to strike Pickett's Facts, and grants CTA's motion for summary judgment.

## BACKGROUND

The following facts taken from the record are undisputed, except where otherwise noted. Per CTA's motion to strike Pickett's Facts, § I.b., *infra*, contains the Court's discussion of what facts it deemed properly before it and therefore appropriate for consideration on summary judgment.

### a. Parties & Places

CTA is an Illinois municipal corporation engaged in providing public transportation services to the Chicago metropolitan area. CTA hired Pickett as a part-time bus operator on July 18, 2005, where, except for a relatively brief layoff period, Pickett continued to work until his retirement on April 6, 2017. Pickett was a member of Amalgamated Transit Union Local 241 ("Union") throughout his employment with CTA. He is presently 68 years old.

### b. CTA Procedures Relevant to Disabled Employees & Disability Accommodations

CTA's Administrative Procedure #1017 covers CTA procedures for employees with "substantial medical restrictions and/or disabilities" who may require reasonable accommodations. Procedure #1017 also establishes the Accommodation Review

Committee ("ARC"), through which employees can request medical accommodations in writing. Upon making such a request, Human Resources' Benefit Services team collects medical and employment information. Benefit Services then works with the employee to determine if the request can be met.

CTA's Administrative Procedure #1601 states that all terms and conditions of employment be administered without regard to any legally protected class, including age and disability, provided that the individual with the disability is able to perform with or without accommodations the essential functions of the job that he or she holds or desires to hold.

CTA's Administrative Procedure #1012 details procedures for both reporting injuries sustained on duty as well as the employee's transitional return to work. Procedure #1012 establishes a Transitional Return to Work ("TRTW") program that returns an injured employee to work at less than their full-duty assignment for "a limited period after they have suffered an injury on duty with the objective to return the employee to full duty as soon as possible." To be placed in TRTW, an employee must be unable to resume unrestricted full duty but be otherwise able to work in a modified capacity. The TRTW policy further indicates as follows:

> Employees with temporary physical or mental limitations sustained as a result of a compensable injury on duty are eligible for TRTW assignments if these temporary physical or mental limitations prevent them from performing their regular duties and there is a TRTW assignment available which the employee is able to perform.

Procedure #1012 also states, "TRTW is temporary in nature and is intended to ease the employee back to regular duty. Employees with restrictions that would permanently prevent them from returning to their full-time jobs will not be provided TRTW work assignments."

### c. Age Discrimination

In deposition testimony, Pickett stated that in or around September 2014, he was playing dominoes at CTA's 74th Street Garage with other employees when his general manager, Randolph Williams ("Williams"), approached him and said, "Mr. Pickett, I'm color-blind, but I can tell that that hat isn't blue," in reference to Pickett's hat and its non-conformance with CTA's uniform policy. Pickett testified that he then had to take his hat off, even though other people playing dominoes "were in different array of not being in mandatory uniforms, and nothing was said to anybody else." Pickett testified that although he never felt that Williams discriminated against him based on his age, he did "start[] suspecting that maybe [Williams] was there to help create an environment of discomfort for [Pickett]," since his prior relationship with Williams while working at a different garage was a "different,…relatively casual and comfortable relationship."

Pickett's Facts state that he "could not find" a CTA provision that required employees to wear hats of a specified color. He cites to an attached exhibit titled "Personnel Bulletin," with a subject line of "Uniform Requirements" and an effective date of March 2, 2014. In its discussion of the acceptable "All-Weather Uniform," the

document states that a "cap" is "optional," so long as it is an "[a]uthorized CTA baseball style cap with CTA patch." The document also contemplates the acceptable uniform for "Winter Weather," which covers the period from October 15 through April 30, and so would not have included the likely date of Pickett's interaction with Williams in September. That section does, however, allow for two types of "hats" to be worn, either of which must be "navy" in color.

After Williams commented on Pickett's hat, another co-worker – not Williams – called Pickett by the name "Pops." Pickett testified that the only name he was ever called that implicated his age was "Pops" and the only CTA employees who utilized the nickname were other "co-workers," not supervisors.

In or about December 2015, Pickett met with a Union representative, Tanno Muhammad ("Muhammad"), to inquire about the status of a grievance that Pickett had filed. During the meeting, Muhammad called an individual at CTA to discuss the grievance. Per Pickett's testimony, Muhammad told Pickett that the individual on the phone inquired, "[S]ince [Pickett] was born in 1948, why doesn't he just retire?" Pickett did not know who Muhammad was talking to nor who made the comment, and he did not ask Muhammad who was on the other end of the line.

Pickett also testified that he was sent "two mailings" regarding benefits that he would receive if he retired. Pickett does not recall who sent him the letters, but he interpreted them as encouraging him to retire. Pickett felt that this was discriminatory because, per his testimony, "I didn't feel that it was anybody's decision to make but

mine when I was going to retire." Pickett also testified that nobody from CTA ever asked him about his age. However, according to Grievance No. 09-0626, filed by Pickett in June 2009, CTA transportation manager Charles Morris ("Morris") told Pickett that he would be charged with a violation. In the same meeting, the grievance states that Morris told Pickett, "Yeah you are old enough to be my father."

### d. Disability Discrimination

On or about April 6, 2011, Pickett was working as a bus operator when he was physically attacked by a passenger. As a result of the attack, Pickett was diagnosed with Post-Traumatic Stress Disorder ("PTSD").

In 2013, Pickett approached his general manager/transportation manager, Keeby McMillon ("McMillon"), to seek assistance. Pickett testified that "she humiliated" him, and he asked her if they could speak in private. Pickett testified that McMillon refused to close the door because she did not want to be alone in the room with him, apparently "because she didn't feel safe." McMillon did not reference Pickett's PTSD during the meeting, but Pickett assumed that she knew about his condition. Pickett felt that McMillon's refusal to close the door during their meeting was an act of disability discrimination.

Pickett also testified that he believed that CTA discriminated against him based on his PTSD when CTA did not permit him to return to work on light duty/TRTW status on three occasions. Pickett could not remember when each of these incidents occurred.

On or about July 22, 2015, while Pickett was working as a bus operator, he was allegedly verbally assaulted by a passenger who refused to pay his fare and threatened Pickett by telling him "if you don't take me downtown, you're going to die." The police eventually arrived, removed the passenger from the bus, and told Pickett to resume service. Pickett continued working his shift and, as a result of the incident, developed a severe headache and numbness in his right arm. At the end of his shift, Pickett took himself to the hospital as he thought he was having a stroke. After being hospitalized for one day, Pickett was diagnosed with having a transient ischemic attack. Pickett testified that the July 22 incident aggravated his PTSD. After the incident, Pickett was off work from July 22, 2015, until December 2015.

Prior to December 2015, Pickett contacted CTA to try to return to work. He was required to get clearance from Concentra, CTA's third party medical services provider, but, per Pickett's testimony, "on a couple of occasions," he "was denied because [his] blood pressure was high." Pickett also testified that when he tried to return to light duty, an unidentified transportation manager told him that there were not any light duty positions available at his work location.

On December 16, 2015, Pickett, on his own accord, returned to work, having been released by Concentra to return to work that same day. Prior to returning to work on December 16, Pickett did not contact CTA's Leave Management Department to inquire about the availability of a vacant budgeted position or receive clearance to return to work. He worked until December 19, 2015, when an unknown CTA

employee informed him via telephone that he could not return without first following proper procedure.

Pickett was placed in Temporary Medical Disability, also known as Area 605, – a program for eligible union employees who have been found medically unfit to perform the essential functions of their job classification due to an illness or injury for sixty days or longer – because he had not cleared all of his medical hurdles and did not follow CTA's procedures for returning or requesting an accommodation. Principally, Pickett needed to complete proper medical testing and drug screening to be able to return to work, but had yet to do so as of December 19, 2015. Pickett then received a letter from CTA's Leave Management Department, dated December 15, 2015, informing him that he was to be placed in Area 605. The letter informed Pickett of the return-to-work process and how to go about requesting an accommodation. CTA employees returning to work from an injury suffered on duty do not automatically get assigned to light duty. Rather, they receive light duty only if it is available and they are medically cleared for it. Pickett's assignment into Area 605 was effective retroactively to December 14, 2015.

Pickett testified that CTA also failed to accommodate his PTSD by "not seeming to acknowledge it." In particular, Pickett contends that CTA did not offer him, or explain how to take, time off under the Family and Medical Leave Act ("FMLA"). Pickett did note, however, that he received a letter indicating that he was

qualified for FMLA leave, and he did not indicate in his deposition that he actually requested to take such leave.

On or about January 6, 2017, Pickett submitted to ARC a request for an accommodation, asking to be placed on light duty. However, before ARC could consider the request, Pickett sent a letter, dated January 19, 2017, retracting the requested accommodation. Pickett testified that he thought he was eligible to work light duty because he had been allowed to do so after he was attacked on April 6, 2011.

Pickett thought that he should be allowed to return to light duty "[b]ecause [he] had been previously from the incident in 2011 and [he] thought the circumstances were similar." Pickett testified that, in December 2015, CTA employees younger than him were permitted to work light duty at the 74th Street Garage. Pickett did not know these employees' ages or names, but he assumed they were younger than him based on their physical appearance. He also knew nothing about their personal circumstances, nor who their supervisors were. Pickett's exhibit titled "TRTW and Non-Operator Assignment Sheet For: Sunday, December 20, 2015" lists seven individuals, including Pickett. The document does not indicate anything beyond the last name of each individual, for how long they were allowed to work per day, and whether they were slotted in TRTW or the "Drivers License Program." The document is signed by "Thomas Thornton, Transportation Manager."

Pickett testified that he wanted to be placed on light duty indefinitely. Per CTA's Administrative Procedure #1012, the TRTW program is temporary in nature and available only when vacancies arise.

Pickett testified that he does not know if his supervisors actually knew about his PTSD. Rather, he assumed that they did because he submitted his medical records to management. To what managers he provided such records, Pickett did not specify.

Pickett further testified that he attempted to come back to work light duty in 2016, but he did not qualify because of his blood pressure and the medication he was taking. Pickett contended that these were additional instances of CTA's failure to accommodate his disability, but he could not identify when or how.

Pickett returned to work at CTA on April 1, 2017. Six days later, on April 6, 2017, he retired. Pickett filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on January 15, 2016 ("EEOC Charge"), alleging retaliation and discrimination based on age and disability.

## LEGAL STANDARD[1]

In considering a motion for summary judgment, the Court construes all facts and draws all reasonable inferences in favor of the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant

---

[1] The Court notes that CTA served on Pickett a Local Rule 56.2 Notice, which explains what Local Rule 56.1 requires of a *pro se* litigant opposing summary judgment. Having reviewed the Notice, the Court finds that it was consistent with the dictates of *Timms v. Frank*, 953 F.2d 281 (7th Cir. 1992), and sufficient for Pickett to be apprised of his responsibilities.

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact arises where a reasonable jury could find, based on the evidence of record, in favor of the non-movant. *Anderson*, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court considers the "record as a whole." *Morgan v. Harris Trust & Sav. Bank of Chicago*, 867 F.2d 1023, 1026 (7th Cir. 1989).

Northern District of Illinois Local Rule 56.1 requires the "party moving for summary judgment to include with the motion 'a statement of material facts as to which the moving party contends there is no genuine issue and that entitle the moving party to a judgment as a matter of law.'" *Ammons v. Aramark Unif. Servs.*, Inc., 368 F.3d 809, 817 (7th Cir. 2004) (quoting N.D. Ill. R. 56.1(a)(3)). "The movant bears the initial burden of showing that no genuine issue of material fact exists." *Genova v. Kellogg*, 2015 WL 3930351, at *3 (N.D. Ill. 2015). "The burden then shifts to the non-moving party to show through specific evidence that a triable issue of fact remains on issues on which the movant bears the burden of proof at trial." *Id.* The non-moving party must respond to the movant's Local Rule 56.1(a)(3) statement and may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits. N.D. Ill. R. 56.1(b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The non-movant must support his contentions with documentary evidence of specific facts that demonstrate that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324.

## DISCUSSION

I. **CTA's Motion to Strike Pickett's Motion**

In its reply brief, CTA moves the Court to strike Pickett's Motion because it "fail[s] to comply with this Court's ordered deadlines and the Local Rules." We address Pickett's complications with both this Court's deadlines and the Local Rules, in reverse order.

CTA notes that Pickett did not follow the strictures of Local Rule 56.1 by failing to "file a supporting memorandum of law or statement of material facts to which he contends there is no genuine issue of fact." Indeed, strictly speaking, Pickett's Motion is neither what the Local Rules call for nor what the Court requested. Rather than filing a motion directly responsive to CTA's motion for summary judgment, Pickett characterized his submission as his own motion for summary judgment. He did not submit a separate motion and memorandum of law, and his statement of material facts – discussed in greater detail, *infra* § II. – is deeply problematic.

But Pickett is a *pro se* plaintiff, one who submitted to the Court a filing that, while technically unsound and formally improper, demonstrated at least some attempt to respond to CTA's arguments in its opening motion. Federal courts may recharacterize the label a *pro se* litigant attaches to a motion and place it within a different legal category "in order to avoid an unnecessary dismissal, to avoid inappropriately stringent application of formal labeling requirements, or to create a better correspondence between the substance of a *pro se* motion's claim and its underlying legal basis." *Castro v. U.S.*, 540 U.S. 375, 381—82 (2003) (internal

citations omitted). Pickett's noncontroversial unfamiliarity with the dogma of federal litigation should not abort his ability to argue his position before the Court. We decline to strike Pickett's Motion for failure to comply with the Local Rules, and instead recharacterize Pickett's "Motion for Summary Judgment" under the more proper categorization of a response to CTA's motion for summary judgment.

CTA also requests that we strike Pickett's Motion for failure to comply with deadlines. The Court set an original briefing schedule that called for a responsive submission on February 13, 2018; Pickett missed that date. One week later, on February 21, 2018, he requested an extension of time to respond to CTA's motion. We granted Pickett's request and afforded him a new deadline of March 13, 2018 – a deadline that Pickett met.

CTA's contention that Pickett's March 13 filing "[came] almost two months after the Court's ordered deadline for the parties to file their summary judgment motions (January 16, 2018)" is a bald-faced untruth. Our minute entry states, "Summary Judgment is due by 1/16/2018. Plaintiff's response is due by 2/13/2018." Unequivocally, this entry reflects that CTA's motion for summary judgment was due on January 16, 2018, and Pickett's response was due on February 13, 2018. Pickett's response, then, was not "almost two months" late when it was uploaded on March 13, 2018. Rather, it was submitted one month after its initial due date, and so submitted with the blessing of this Court's extension of time. To suggest that Pickett so blatantly disregarded this Court's calendar such that a striking of his entire responsive

pleading would be warranted is as disingenuous as it is callous. CTA's request is denied, we recharacterize Pickett's Motion as a response to CTA's motion for summary judgment, and proceed accordingly.

## II.   CTA's Motion to Strike Pickett's Facts

CTA also asks the Court to strike Pickett's Rule 56.1 factual submission or, in the alternative, deem CTA's statement of facts admitted. CTA identifies the following issues in Pickett's Facts as reason for the Court to strike his filing: (1) Pickett's repeat qualified admissions that set forth argument, legal conclusions, and irrelevant facts; (2) Pickett's failure to provide a response to the substance of CTA's statement of facts; and (3) Pickett's routine failure to cite to the record to support his alleged facts and arguments. Even a cursory read of Pickett's Facts reveals each of CTA's highlighted problems to be abundant and true.

Rather than respond directly to CTA's factual recitation, Pickett frequently cherry-picks specific facts from CTA's 56.1 filing to use as a springboard into questionably relevant factual disquisitions. His interaction with CTA's facts are commonly argumentative and conclusory, and rarely directly responsive to the substance of whatever fact is in issue. Pickett's penchant for desultory discourse would not be so alarming were it not for his glaring failure to support his responses with citations to the record. This is a fundamental problem, one that directly contravenes Rule 56.1's function, as highlighted by CTA:

The purpose of Rule 56.1 is to have the litigants present to the district court a clear, concise list of material facts that are central to the summary judgment determination. It is the litigants' duty to clearly identify material facts in dispute and provide the admissible evidence that tends to prove or disprove the fact. A litigant who denies a material fact *is required to provide the admissible evidence that supports his denial in a clear, concise, and obvious fashion*, for quick reference of the court.

*Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015) (emphasis added). As CTA also noted, the requirement of citations to the record is especially crucial in a case like this. "Employment discrimination cases are extremely fact-intensive, and neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes." *Greer v. Bd. of Educ.*, 267 F.3d 723, 727 (7th Cir. 2001) (internal citation and quotation marks omitted).

We are confident, then, that even with Pickett's *pro se* status, the striking of his facts would not be beyond the pale. *See F.T.C. v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 ("Because of the important function local rules like Rule 56.1 serve in organizing the evidence and identifying disputed facts, we have consistently upheld the district court's discretion to require strict compliance with those rules"); *see also Abdel-Ghaffar v. Ill. Tool Works, Inc.*, No. 12 C 5812, WL 5025461, at *6—7 (N.D. Ill. Sept. 30, 2015) (striking a *pro se* plaintiff's Rule 56.1 response for failure to comply with the local rule). To deem CTA's facts admitted at the expense of Pickett's Facts would accomplish virtually the same goal.

Here, however, we decline to pursue either tack in full, where at least some entries in Pickett's Facts are directly responsive to CTA's facts and include proper

citations to the record. While we appreciate our reviewing court's blessing to "not scour a record to locate evidence supporting a party's legal argument," *Estate of Moreland v. Dieter*, 395 F.3d 747, 759 (7th Cir. 2005), in those few instances where Pickett made the effort to incorporate the record, we went about reviewing the cited portion of the record to determine if his assertion accurately reflects the evidence to which it cites.

The effect of our determination is this. Wherever Pickett wholesale declined to cite to the record to support his assertions, we have disregarded his characterizations and – where the record supports its assertion – accepted CTA's as true, since no foundational opposition exists to CTA's fact. Wherever Pickett cited to a portion of the record that clearly failed to support his assertion, we have similarly disregarded the proposed fact, and accepted CTA's well-founded assertion as true. Where Pickett was non-responsive or offered plainly irrelevant material, we have also disregarded the response. Finally, wherever Pickett properly incorporated the record to push against CTA's 56.1 statement, we have integrated his cited evidence into our own factual recitation.[2] As a result, although we deny CTA's motion to strike Pickett's Facts or, in the alternative, deem CTA's 56.1 facts admitted, a great many of CTA's well-founded facts were ultimately deemed admitted under our piecemeal approach, and they informed the lion's share of the factual record before us.

---

[2] In accordance with the methodology detailed above, the following facts from Pickett's Facts have been disregarded by the Court in their entirety: 3, 8, 16, 17, 18, 20, 25, 26, 32—35, 38, 40, 43—58, and 60—68. The following of Pickett's Facts have been disregarded in part and considered in part: 8, 14, 30, and 31. From CTA's 56.1 submission, the Court disregarded in part and considered in part fact 37.

### III. Statute of Limitations

"In Illinois, an employee may sue under the ADEA or ADA only if he files a charge of discrimination with the EEOC within 300 days of the alleged 'unlawful employment practice.'" *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 637 (7th Cir. 2004). Pickett filed his EEOC charge on January 15, 2016. Therefore, any allegations of discriminatory misconduct that occurred before March 22, 2015, are barred under the 300-day statute of limitations.

According to CTA, that renders the following incidents time-barred: (1) the April 2011 incident where Pickett was attacked and subsequently diagnosed with PTSD; (2) McMillon's alleged disability discrimination when she refused to close the door during her meeting with Pickett in 2013; and (3) Pickett's incident of alleged age discrimination in September 2014, when Williams, Pickett's supervisor, allegedly chastised Pickett for wearing an unauthorized hat and another co-worker allegedly called Pickett by the name "Pops."

The Court agrees with CTA as to the second and third incidents. Pickett's 2013 interaction with McMillon occurred, at a minimum, three years before the EEOC Charge was filed. The comment from Williams and the co-worker's comment of "Pops" occurred were uttered sixteen months before Pickett filed his charge. Both incidents were discrete confrontations that accrued well before March 22, 2015, and Pickett offers no response to CTA's contention that they should be time-barred. *See Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an

argument…results in waiver"); *see also Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 810 (7th Cir. 2001) (the plaintiff waived his claim "by failing to press it before the district court"). Pickett's claims that he was discriminated against in 2013 by McMillon and again by Williams and an unknown co-worker in September 2014 are time-barred.

Although neither party presses the allegation with much vigor, the Court also noted an exhibit of Pickett's that detailed a confrontation with transportation manager Morris in 2009. The grievance states that Morris allegedly told Pickett during the incident, "Yeah you are old enough to be my father." Again, the parties hardly address this episode, but it is record evidence. Having taken it under consideration, the Court finds that it is also time-barred, having occurred more than half a decade before March 22, 2015.

The Court rejects CTA's request to bar from consideration Pickett's 2011 assault and subsequent PTSD diagnosis. Certainly, Pickett may question CTA's treatment of him *after* he was diagnosed with PTSD. In his opposition brief, he states, "I was diagnosed with [PTSD] in 2011 after a passenger attacked me and CTA transportation managers failed to provide adequate and professional support." Pickett goes on to detail the issues he had with CTA's treatment of him following this diagnosis. Pickett does not, however, identify the 2011 incident as a discrete example of CTA's discrimination against him. Such a contention, that a passenger's inexplicable attack on Pickett somehow evidences CTA's animus towards its

employee, would be preposterous. Pickett rightly refrains from arguing as such. The 2011 incident is before us for a contextual purpose, not a legally actionable one; it is not time-barred.

## IV.   Pickett's Discrimination Claims

Courts in the Seventh Circuit analyze employment discrimination claims under two standards. Under either analysis, "all evidence belongs in a single pile and must be evaluated as a whole." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 766 (7th Cir. 2016). We address Pickett's age discrimination claim first, before turning to the disability discrimination issue.

### a.  Age Discrimination

#### i.  *McDonnell Douglas* **burden-shifting standard**

One route by which Pickett can establish a case of employment discrimination is via the burden-shifting standard set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under this model, Pickett must demonstrate that: (1) he was a member of a protected class; (2) he was performing to CTA's legitimate expectations; (3) despite his performance, he suffered an adverse employment action; and (4) others, similarly situated but not in the protected class, were treated more favorably. *Id.* If Pickett can establish these elements, the burden shifts to CTA to demonstrate a legitimate, non-discriminatory reason for Pickett's treatment. *Geier v.*

*Medtronic, Inc.*, 99 F.3d 238, 241—42 (7th Cir. 1996). If CTA meets this burden, Pickett must demonstrate that the proffered explanation is pretextual. *Id.*

CTA argues that Pickett can demonstrate neither of the last two prima facie elements on his ADEA claim – that he suffered an adverse employment action and that he was treated unfavorably as compared to other, similarly situated but non-protected employees.

Because Pickett's interaction with Williams is time-barred, the only employment actions implicative of Pickett's age that the Court can discern as arguably adverse are: (1) the December 2015 telephone comment from an unknown individual, relayed to Pickett by Muhammad, in which the individual on the phone asked, "[S]ince [Pickett] was born in 1948, why doesn't he just retire?"; and (2) the mailings that Pickett received discussing retirement benefits.

At the outset, we note that Pickett discusses neither incident in his response. Indeed, Pickett hardly discusses his ADEA claim at all. Pickett is acting *pro se*, and the Court has taken painstaking care to afford Pickett's claims careful attention. However, "[i]t is a well-settled rule that a party opposing a summary judgment motion must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered." *Liberles v. Cook Cnty.*, 709 F.2d 1122, 1126 (7th Cir. 1983). Arguments not raised before the district court in response to summary judgment are waived. *Arendt v. Vetta Sports, Inc.*, 99 F.3d 231, 237 (7th Cir. 1996); *see also Cent. States, Se. & Sw. Areas Pension Fund v. Midwest Motor Express*, 181 F.3d 799, 808

(7th Cir. 1999) ("Arguments not meaningfully developed in any way are waived").  It was Pickett's responsibility to develop a position regarding the viability of his age discrimination claim, a responsibility which he failed to uphold.

Lacking a position of opposition, the Court can find no path steeped in reason to contravene CTA's argument that these incidents do not constitute actionable adversity.  "Adverse employment actions for purposes of the federal antidiscrimination statutes generally fall into three categories: (1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge." *Barton v. Zimmer*, 662 F.3d 448, 453—54 (7th Cir. 2011).

Plainly, neither incident implicated Pickett's terms of employment or future career prospects.  As to the third general category, a phone call from an unknown CTA employee prodding not the plaintiff himself, but a Union representative, about Pickett's age is hardly an "unbearable change in job conditions."  "[N]ot everything that makes an employee unhappy is an actionable adverse action…. Otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *O'Neal v. City of Chi.*, 392 F.3d 909, 911 (7th Cir. 2004) (internal citations and quotation marks omitted).  A discussion between employees that Pickett happened to be privy to, wherein but one

arguably condescending remark was made, is definitively one such triviality. It was immaterial, and an insufficient basis on which to ground a discrimination claim.

The same goes for the pair of mailings that Pickett received. For starters, Pickett presents no evidence that there was anything adverse about the letters beyond his own jaded interpretation of them. Moreover, an objective reading of the letters in the record reveals them to be little more than informational offerings. The only reasonable interpretation of the documents is that they were of a helpful sort, not adverse. In any event, Pickett does not know who sent him the mailings, and he only identified them as discriminatory because he "didn't feel that it was anybody's decision to make but mine when I was going to retire." The letters do not quarrel with Pickett's feelings and never suggested that it was somebody else's decision. Pickett's basis for finding the letters discriminatory is unreasonable. The letters were, at worst, another triviality, and more likely, a useful tool for a veteran employee. They do not constitute an adverse employment action.

Finally, for posterity's sake, we note that, for his age discrimination claim, Pickett did not even attempt to demonstrate that similarly situated CTA employees were treated more favorably than he. On his ADA claim, Pickett at least offered some documentation, albeit flawed, in this vain. *See infra* § IV.b.i. Not so on his ADEA cause of action. Having failed to demonstrate an adverse employment action based on his age, and having failed to show that similarly situated, non-protected individuals

received more favorable treatment, Pickett cannot carry his burden under *McDonnell Douglas*.

### ii. *Ortiz* reasonable factfinder standard

Under *Ortiz,* we ask "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's…proscribed factor…caused the discharge or other adverse employment action." 834 F.3d at 765; *see Cole v. Bd. of Tr. of N. Ill. Univ.*, 838 F.3d 888, 899 (7th Cir. 2016) (internal citations omitted) ("the critical question…is simply 'whether a reasonable jury could infer prohibited discrimination'"). The evidence before the Court must be considered as a whole, not bit by bit. *Ortiz*, 834 F.3d at 760.

As discussed above, the Court is hard-pressed to discern a single occasion of actionable age-based adversity against Pickett. Without a reasonably inferable adverse employment action in the record, no factfinder could conclude that age-based discrimination took place. Additionally, Pickett offers no *Ortiz*-adjacent argument in his response brief, so any relevant putative argument that could be made on his behalf is waived. *Arendt*, 99 F.3d at 237.

Lacking a demonstrable issue of material fact and having failed to show under *McDonnell Douglas* or *Ortiz* that the record contains evidence of actionable discrimination, Pickett cannot succeed on his ADEA claim. The Court awards summary judgment in CTA's favor as to Pickett's age discrimination claim.

### b. Disability Discrimination

#### i. *McDonnell Douglas* **burden-shifting standard**

As with his ADEA claim, CTA again argues that Pickett has failed to establish both of the last two prima facie *McDonnell Douglas* elements – that he suffered an adverse employment action and that he was treated unfavorably as compared to other, similarly situated but non-protected employees.  In opposition, Pickett contends that CTA transportation managers "failed to provide adequate and professional support" in the wake of his PTSD diagnosis, primarily in that he "was not allowed to work light duty which similarly situated bus operators were able to."  Pickett also contends that his PTSD was "exacerbated by episodes with angry or threatening passengers and hostile managers."  Finally, Pickett accuses CTA attorneys of having improperly redacted his deposition transcript and deflected his efforts to depose "Mrs. Monica McMillan-Robinson, members of the Leave Management staff, and Sedgwick Claims Management personnel."

Briefly, as to Pickett's accusations of CTA's impropriety, the Court notes that it has been provided with no evidence of such.  No evidence of improper redaction, no evidence of untoward interference with Pickett's evidence-collection efforts, no evidence of anything to suggest either brand of misconduct.  Without evidence to

support his unfounded allegations of CTA's behavior, the Court emphatically rejects Pickett's attendant arguments.

Turning to Pickett's suggested adverse employment actions, we begin with his "hostile managers" contention. The only arguable instance of a CTA manager treating Pickett with hostility because of his PTSD is Pickett's interaction with McMillon, which the Court has already barred from consideration as untimely under the applicable statute of limitations. The record is otherwise bare regarding supposed disability hostility from Pickett's supervisors; the Court finds no adverse employment action based on manager hostility.

Additionally, Pickett offers no authority for his suggestion that CTA is somehow responsible for the anger and threats of bus passengers, and the Court can find no case law to support such a proposition. Certainly, CTA was required to uphold its ADA requirements in the wake of Pickett's PTSD diagnosis, but it cannot be held responsible for the actions of non-employees who acted out of line while riding public transportation.

Cutting to the quick, Pickett's central issue with CTA is not that its managers or customers might have treated him less than ideally, but rather that CTA itself failed to adequately support his PTSD when it allegedly kept him from working TRTW, despite allowing others, similarly situated, to occupy light duty roles. The first inquiry – whether CTA's declination to place Pickett on light duty amounted to an adverse employment action – is almost certainly no. Pickett himself seems to suggest

that his inability to operate a bus required a permanent reassignment to a different position. As discussed below, however, the ADA does not require employers to reassign disabled employees to permanent light duty. Nor does it entitle a disabled employee to whatever accommodation he wants. *See infra* § V.

Moreover, the factual timeline indicates that Pickett's troubles returning to work, light duty or otherwise, were routinely the result of his issues obtaining medical clearance. The record reflects a recurring struggle with high blood pressure, one that kept CTA from allowing Pickett back to work even had it so desired. In 2015, when Pickett finally did receive Concentra's clearance to return to work, he declined to request an accommodation. In 2017, when Pickett ultimately did submit a proper request to be placed on TRTW, CTA was unable to accommodate Pickett because he retracted the request less than two weeks later.

Finally, Pickett's stated inability to receive a TRTW assignment is belied by his own Exhibit B, a TRTW assignment sheet dated December 20, 2015. On it, Pickett is listed next to an entry that reads "TRTW 8 Hours Per Day." It also indicates that Pickett began a TRTW role on December 18, 2015. The only reasonable inference to be drawn from this document is that Pickett's supervisor placed him on temporary light duty when he briefly returned to work for a few days in 2015, from December 16 until December 19. Pickett was then taken off light duty when CTA discovered that he was working again without its approval. Pickett was placed in Area 605, from which he could return to light duty if he requested the accommodation and had it

approved. His failure to request a TRTW role, despite being instructed on how to do so in a letter sent to him by CTA, kept Pickett from the program until he finally submitted a proper recommendation in January 2017, which itself proved fruitless because of his retraction.

The legal upshot of this is that Pickett was not discriminated against because of his disability, but rather that he was accommodated for a time, and then given an opportunity to re-seek said accommodation through the Temporary Medical Disability program. We discern no adverse employment action from such a circumstance.

Even had adversity colored Pickett's interactions with the TRTW program, his own exhibits fail to satisfy the last prima facie *McDonnell Douglas* element, that others, non-protected but similarly situated, were treated more favorably. The only evidence that touches this concern is the document from December 20, 2015, which lists other CTA employees at the 74th Street Garage who were on TRTW or non-operator assignment. The document lists five individuals on TRTW status, including Pickett. Rather than show that he was treated unfavorably, though, the document shows that Pickett was accommodated in the same fashion as others at his workplace. Moreover, assuming *arguendo* that the document did illuminate some disparate treatment, it offers no identifying characteristics about the individuals enlisted. Ages, genders, ethnicities, and any other relevant traits necessary for a similarly-situated analysis are absent. Regardless, the document firmly supports CTA's position. Pickett was treated just like his co-workers, a far cry from disfavor.

Finally, as was the case with his age discrimination claim, we note that Pickett himself offered almost nothing in the way of affirmative argument supporting his ADA claim. The vast majority of the Court's consideration was informed by its own research and record-scouring. While the Court conjured many an argument for him, we continue to recognize that arguments not raised in response to summary judgment are waived. *Arendt*, 99 F.3d at 237. Having failed to demonstrate an adverse employment action based on his disability, and having failed to show that similarly situated, non-protected individuals received more favorable treatment, Pickett has failed to carry his *McDonnell Douglas* burden.

### ii. *Ortiz* reasonable factfinder standard

Once more, and for the reasons just articulated, the Court is unable to find a material fact suggestive of disability discrimination. No record evidence suggests that he was mistreated by co-workers because of his PTSD, and no record evidence indicates that he was withheld from the TRTW program because of his PTSD. Lacking either, we cannot reasonably conclude that any disability discrimination took place. As to the ADA discrimination claim, the Court awards summary judgment in CTA's favor.

## V. Failure to Accommodate Claim

The final issue before us is Pickett's charge that CTA failed to accommodate his disability. To establish such a claim, Pickett "must point to evidence that…would demonstrate that (1) he is a qualified individual with a disability, (2) his employer was

aware of the disability, and (3) his employer failed to reasonably accommodate that disability." *Reeves ex rel. Reeves v. Jewel Food Stores, Inc.*, 759 F.3d 698, 701 (7th Cir. 2014).

CTA makes a half-hearted attempt to argue that its supervisors may not have been aware of Pickett's PTSD, but it is the third prong that settles this issue. As CTA notes, "[T]he ADA does not entitle a disabled employee to the accommodation of his choice. Rather, the law entitles him to a *reasonable* accommodation in view of his limitations and his employer's needs." *Swanson v. Vill. of Flossmoor*, 794 F.3d 820, 827 (7th Cir. 2015). This axiom mutes Pickett's sworn testimony, where he stated that he should have been allowed to return to light duty "[b]ecause [he] had been previously from the incident in 2011 and [he] thought the circumstances were similar." The law expressly condemns this brand of expectancy. That Pickett thought he should be placed on TRTW does not make it so.

Moreover, Pickett testified that rather than work as a bus operator, he wanted to be placed on light duty permanently, this despite TRTW's stated purpose as a program for temporary placement. The Seventh Circuit has rejected this line of thinking full-stop. "An employer need not create a new job or strip a current job of its principal duties to accommodate a disabled employee. Nor is there any duty to reassign an employee to a permanent light duty position." *Gratzl v. Office of Chief Judges of 12th, 18th, 19th, & 22nd Judicial Circuits*, 601 F.3d 674, 680 (7th Cir. 2010) (internal citations and quotation marks omitted).

CTA had no duty to immediately assign Pickett to light duty when it discovered he had begun working again, and it certainly was not required to offer him such status on a permanent basis. That Pickett declined to follow procedure for returning to work, and then failed to request his desired accommodation once he was placed in Area 605, is not CTA's fault, but his own. "[T]he standard rule is that a plaintiff must normally request an accommodation before liability under the ADA attaches." *Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co.*, 201 F.3d 894, 899 (7th Cir. 2000). The only accommodation request we have evidence of was the one that Pickett himself stymied when he retracted his January 6 request less than two weeks later, on January 19, 2017. CTA cannot be held liable for failing to accommodate an employee who never, in fact, requested the accommodation at issue. On the ADA failure to accommodate issue, we award summary judgment in CTA's favor.

## CONCLUSION

For the aforementioned reasons, the Court denies CTA's motion to strike Pickett's Motion, denies CTA's motion to strike Pickett's Facts, and grants CTA's motion for summary judgment. It is so ordered.

_____
Charles P. Kocoras
United States District Judge

Dated: 7/18/2018